LIMA JEVREMOVIC
8033 W Sunset Blvd, Suite 353
Los Angeles, CA 90046
(310) 200-7753
Email:  lima@meetaura.io

LIMA JEVREMOVIC, IN PRO PER



FILED

CLERK, U.S. DISTRICT COURT

12/18/2025

CENTRAL DISTRICT OF CALIFORNIA

BY _____asi_____ DEPUTY

DOCUMENT SUBMITTED THROUGH THE
ELECTRONIC DOCUMENT SUBMISSION SYSTEM

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| Lima Jevremovic,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>Brandon "Bam" Margera<br><br>　　　　Defendant. | Case No. 2:25-cv-12027-UA<br><br>**COMPLAINT FOR:**<br>　1. **DEFAMATION - LIBEL / SLANDER**<br>　2. **HARASSMENT / CIVIL THREATS**<br>　3. **INVASION OF PRIVACY - PUBLIC DISCLOSURE OF PRIVATE FACTS**<br>　4. **INVASION OF PRIVACY - FALSE LIGHT**<br>　5. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>　6. **ECONOMIC / BUSINESS HARM**<br>　7. **INJUNCTIVE RELIEF - REMOVAL OF DEFAMATORY CONTENT AND PUBLIC RETRACTION**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**DATE:**<br>**TIME:**<br>**DEPT:**<br><br>**Judge:**<br>**Dept:** |

---

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1

## I. **PARTIES**

To the Honorable Court,

I, Lima Jevremovic, respectfully submit this Complaint against Brandon "Bam" Margera. I am the founder of a software company called Autonomous User Rehabilitation Agent (AURA), a digital health startup focused on leveraging data and behavioral patterns to assist clinicians in providing better care for their clients through tools such as our telehealth app and Virtual Rea;ity platform. In addition, I volunteered my time to help individuals struggling with substance use or mental health challenges, connecting them to resources, advocating on their behalf, and supporting their treatment journeys working alongside licensed attorneys and medical professionals.

Defendant, Brandon "Bam" Margera, is a public figure and media personality who has leveraged his celebrity status and public platforms (including social media, podcasts, and interviews) to make repeated false and malicious statements about me. Despite privately seeking and relying on my professional assistance to manage his medical care and comply with court-ordered treatment, Defendant has publicly misrepresented our interactions, falsely portraying me as abusive, manipulative, a criminal, a murderer and as someone who purportedly sought to harm him and cause his death. Defendant knowingly disseminated these false narratives to a wide audience, mobilizing followers to harass, threaten, and intimidate me, causing severe reputational, financial, and emotional harm.

## II. **STATEMENT OF THE CASE**

Defendant has repeatedly and knowingly published false statements about me to evade accountability for his personal and legal obligations, while simultaneously enhancing his public image by portraying himself as a victim and mobilizing his fan base against me. These statements are demonstrably false and have caused substantial harm to my personal safety, emotional well-being, reputation, and livelihood.

Defendant's defamatory statements include claims that I coerced or forced him into treatment, stole from him, manipulated his affairs for personal gain, and was responsible for harming or killing others. In reality, Defendant's own documented medical history and treatment needs contradict these claims. These false statements have been repeated over several years through podcasts, social media, interviews, and public appearances, and are ongoing.

Defendant intentionally used these false narratives to create fuel behind a "Free Bam" movement, modeled after high-profile celebrity conservatorship campaign of Britnet Spears. In doing so, Defendant positioned me as the antagonist, publicly vilifying me and leveraging his fame to mobilize followers against me. **[EXHIBIT C]**

The foreseeable result of these actions was harassment, threats, and intimidation, which has significantly impacted my daily life, housing stability, and ability to maintain professional relationships.

### III. <u>BACKGROUND</u>

I first became acquainted with Defendant in late 2021 while I was engaged in advocacy and fundraising efforts for a woman named Amanda Rabb, who at the time was in recovery at a mental health treatment facility. Using my existing social media presence, I raised funds to help cover Ms. Rabb's medical expenses so she could access long-term recovery support. I was introduced to Defendant through several mutual acquaintances, and over the course of several months we communicated by phone and videocalls, during which Defendant shared his struggles with addiction and recovery. In December 2020, Defendant agreed to assist with fundraising for Ms. Rabb by participating in a social media collaboration. The agreement was that Defendant would post the GoFundMe campaign and Amanda's story on his social media platforms, and in exchange I would acknowledge his support in an interview on the YouTube channel *Soft White Underbelly*, post a collaboration interview on my own YouTube channel, and share a related clip on Instagram. I performed some of my obligations under this agreement, including publicly crediting Defendant for his support during my *Soft White Underbelly* interview and mentioning him in an Instagram post.

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Pursuant to the collaboration, I traveled to San Diego to film content with Defendant. Upon arrival, Defendant's behavior was erratic, aggressive, and deeply disturbing. He repeatedly demanded that his wife wear crotchless underwear in front of me, and two male colleagues assisting me, and screamed at her whenever she attempted to speak, stating she was not "allowed" to talk unless she complied by stripping. In the interview Defendant described hearing voices, displayed escalating agitation, and created an environment that felt unsafe and predatory. I immediately stopped filming and ultimately chose not to use the footage out of concern for the safety of those present (his wife and child) and out of respect for his family. After the camera was turned off, Defendant became increasingly aggressive because he wanted to continue filming and began breaking objects inside the home. His wife was visibly attempting to protect their child, Phoenix, and my colleague and I were forced to quietly exit the property through the back of the house to avoid further confrontation. Following this incident, I ceased all contact with Defendant and no longer wished to proceed with the collaboration or have him promote the fundraiser, notwithstanding the fact that I had already fulfilled a portion of the agreement publicly.

In May 2021, Amanda Rabb passed away while receiving treatment at a facility in Las Vegas, Nevada. During this period, I was grieving the loss of this Ms. Rabb and was actively involved in planning her funeral, and I informed those around me that I intended to focus on personal matters. Around this same time, members of Defendant's family began contacting me seeking guidance related to intervention and recovery support for Defendant. I advised the family that I was willing to share general information but declined to assume any formal role or provide direct assistance due to my personal circumstances.

As Defendant's condition continued to deteriorate and concerns regarding his safety and the safety of others increased, the family repeatedly renewed their requests for assistance. I initially declined each request.

On May 25, 2021, Jeffrey Tremaine (Defendant's longtime collaborator and the director and executive producer of the *Jackass* franchise, including *Jackass 4*) filed a petition for a restraining order against Defendant in Los Angeles Superior Court, which was granted for a period of three

years; in the petition, Tremaine stated that he feared for his and his family's personal safety and alleged that Defendant had made death threats toward him and his family following Defendant's removal from *Jackass 4* for failing to comply with contractual sobriety requirements. **[EXHIBIT A]**

In June 2021, however, when an acute crisis arose and the family was unable to secure alternative support, I agreed to assist on a limited basis by serving as guardian, subject to the conditions that my involvement remain private and that I not personally incur costs. I further advised the family that I would not charge for my time or services.

On June 11, 2021, pursuant to an *Order Appointing Emergency Temporary Guardian with Inpatient Mental Health Authority*, I became involved with Defendant in a professional and protective capacity as his court-appointed guardian. This appointment occurred during a period in which Defendant's mental health and substance-related conditions required immediate and structured intervention, as reflected in the court record. Defendant's family repeatedly contacted me seeking urgent assistance due to escalating concerns regarding his safety and stability.

My role was undertaken in good faith and was limited to ensuring Defendant's safety, facilitating access to appropriate medical and psychiatric care, and assisting with compliance with court-ordered obligations. I received no compensation for this work, which was performed as a professional courtesy and based on my experience assisting individuals in crisis.

Even without reference to medical records, the public court record establishes the severity of Defendant's condition at the time the temporary guardianship was imposed. Under Arizona law, a temporary guardianship is generally limited to a duration of three months. In Defendant's case, the presiding judge extended the temporary guardianship to a full year, reflecting a judicial determination that continued oversight was necessary to address Defendant's ongoing safety, medical, and compliance needs. This court determination is inconsistent with Defendant's later public statements asserting that no such intervention was warranted or that treatment requirements were fabricated or improper. Medical records and contemporaneous documentation further exist that corroborate the necessity and scope of the care provided during this period.

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

From the outset of the court-ordered guardianship, Defendant failed to comply with its requirements. Contemporaneous communications and administrative records from the facility (facility A) reflect that Defendant repeatedly stated he did not intend to follow court directives, declined to participate in recommended programs, refused to cooperate with clinical staff, and rejected offered support services, despite ongoing efforts to facilitate compliance.

Contemporaneous records indicate that Defendant frequently used the telephone to contact family members, often yelling, making threats, and calling law enforcement to request wellness checks on family members during late-night hours, sometimes around 3:00 a.m. or 4:00 a.m., which disrupted their rest and daily routines.

In August 2021, Defendant requested a transfer to Florida, asserting that he would have greater support from family and friends there, notwithstanding ongoing efforts by his family (including visits by his wife and child) to participate in the Arizona-based program. As his court-appointed guardian, my role was to facilitate compliance with the court order while reasonably accommodating Defendant's stated preferences in a manner consistent with safety and court approval. With authorization from the Arizona court, I arranged for Defendant's transfer to a treatment program in Florida and coordinated travel with a family friend of Defendant to support his admission.

Contemporaneous administrative and treatment records reflect that Defendant admitted himself to a treatment facility in Tampa, Florida ("Facility B"), and that he was intoxicated at the time of admission. Those records further reflect that Defendant left the facility without authorization after approximately ten (10) days. Following his departure, Defendant traveled between Bradenton and Orlando, Florida, during which time reports indicate continued substance use.

On September 26, 2021, I was contacted directly by a woman who reported an incident involving Defendant and expressed concern for his mental condition and safety, as well as the safety of others. In response, and consistent with my role, I coordinated with responders and an intervention specialist to facilitate Defendant's transfer to another treatment facility ("Facility C"). Records exist documenting these efforts and the circumstances necessitating further

intervention. Media outlets also reported on this incident, including publications stating that Defendant ruptured a woman's breast implant during the altercation. **[EXHIBIT B]**

As a result of the Florida incident involving the woman, Defendant was subject to a court-ordered intervention under the Florida *Marchman Act*, representing a separate judicial order from the Arizona guardianship previously described.

Records from November 14, 2021, from Facility C indicate a court recommendation for a higher level of care due to Defendant's lack of engagement with treatment and erratic, concerning behavior, including refusal to maintain basic hygiene, which posed a risk to his health and reflected diminished mental capacity.

In December 2021, Defendant was admitted to Facility D, where contemporaneous records indicate that he repeatedly refused to shower, change clothes, participate in programming, and follow facility rules, demonstrating ongoing noncompliance and lack of engagement. Records further show that Defendant started a fire outside his cabin and was deemed a danger to himself and others at the facility. Due to these safety concerns, Facility D recommended an extension of the Florida *Marchman Act* order and requested that Defendant be transferred from their care for safety reasons related to the fire incident.

From February 2022 through May 2022, Defendant was admitted to Facility E's residential program. Contemporaneous records indicate that during this period, he demonstrated significant improvement, including following facility rules, maintaining personal hygiene, and participating in programming. Facility staff noted that he was regaining mental capacity, and he was able to see his son on an ongoing basis.

In May 2022, Defendant was transitioned to Facility E's Partial Hospitalization Program ("PHP"), a step-down level of care in which participants reside in sober living arrangements and are permitted greater freedom, including leaving the facility for approved activities, while continuing structured treatment during the day. The clinical team recommended this lower level of care and an extension of the Florida *Marchman Act* order to oversee his step-down and facilitate reintegration with his wife and child.

While in the PHP program, Defendant was afforded significant flexibility, including the ability to leave the facility for approved activities. On one occasion, he participated in a weekend trip to Disneyland in Orlando without clinical supervision. Defendant requested that I accompany him to care for their son during this time, allowing him and his wife to spend time together, and I agreed to do so in my role as guardian and support coordinator.

During this period, Defendant experienced interpersonal difficulties with his wife that contributed to episodes of aggression and relapse, and he left the PHP program without authorization on two occasions, each requiring police intervention.

Contemporaneous records indicate that Defendant also contacted media outlets, including TMZ, making statements about conditions at Facility E in an attempt to influence the program's response. Facility staff and clinical documentation reflect that had Defendant remained compliant and sober, there were no plans to petition for an extension of the *Marchman Act* order. On the first unauthorized departure, the clinical team and I informed the court that the incident was related to personal difficulties with his wife and excused the relapse. Contemporaneous records exist documenting these events and interventions.

On May 12, 2022, we discussed the termination of my guardianship and my decision to step away due to the reputational impact and the heightened attention this situation had drawn to me and my family. Defendant requested that I continue assisting him privately, and he agreed that this arrangement would remain confidential. I consented to continue providing limited support under the condition that it remain out of the public eye. On that same date, Defendant signed and notarized Healthcare Directive Agent documentation, voluntarily extending my authority to perform the same responsibilities I had undertaken under the guardianship.

In June 2022, the Arizona one-year temporary guardianship expired, and I did not seek renewal, despite recommendations from Defendant's medical team that additional oversight would support his health, safety, and compliance with court-related obligations, including demonstrating medical adherence for child visitation purposes.

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Following the expiration of the guardianship, I continued to provide Defendant with limited supportive assistance. Contemporaneous records and communications show that, while Defendant privately sought and relied upon my assistance, he simultaneously made public statements portraying himself as a victim of my actions. Defendant used social media and interviews to present these claims, despite knowing that I could not publicly respond or disclose private medical information without violating HIPAA and other privacy protections to defend myself. These public statements were inconsistent with Defendant's private requests for assistance and support as records show.

For example, in June 2023, Defendant continued to make public statements about me that were false and disparaging, while simultaneously relying on me to facilitate his medical needs when necessary. During a 5150 psychiatric hold in California, Defendant repeatedly resisted treatment and enlisted third parties, including Lamar Odom, to advocate for his early release. During this time, Defendant and Odom publicly promoted a treatment center that Defendant never actually attended.

Defendant also used intermediaries, including Odom's agent, Gina Rodriguez, to contact me with claims that I had abused or manipulated him. Approximately ten days later, Rodriguez again contacted me regarding Defendant's medication, reporting that he had not attended the facility and had been at Odom's residence during this period. I responded to these calls and coordinated the necessary follow-up to ensure his safety and access to medications. Contemporaneous records document these interactions and illustrate Defendant's pattern of publicly misrepresenting events while privately relying on my professional assistance.

Defendant publicly spread false statements about me, including claims that I coerced him into treatment, profited from his stays at treatment facilities, manipulated his affairs for personal gain, and caused physical harm to him, caused the death of Amanda Rabb and caused the death of others. Defendant further claimed that I had placed him in a so-called "Florida Shuffle," asserting that he was forced into more than fifteen different treatment facilities. The term "Florida Shuffle" refers to a pattern in which certain treatment providers, sometimes referred to as "body brokers," exploit individuals struggling with substance use or mental health disorders

by repeatedly cycling them through multiple treatment programs. These programs can involve frequent transfers between facilities, unnecessary admissions, or extended stays driven by financial incentives rather than clinical need, often causing patients to receive fragmented or insufficient care.

Defendant's public statements suggesting that I orchestrated such a scheme are false and seriously misleading, as they portray me as participating in exploitative practices that I did not engage in, while contemporaneous medical and legal records demonstrate that all of his treatment and transfers were based on clinical recommendations, his noncompliance, or court-ordered interventions. These statements were categorically false and directly contradicted medical and legal documentation in my possession.

Defendant amplified these false statements through podcasts, social media, and interviews, including a December 19, 2024 podcast, in which he portrayed me as abusive and manipulative. Defendant further promoted a "Free Bam" movement, modeled after celebrity conservatorship campaign "Free Britney" of Britney Spears, framing himself as a victim while casting me as the antagonist, calling himself the Britney Spears of Jackass in multiple public interviews. **[EXHIBIT C]**

As a direct result of Defendant's false statements I experienced harassment, threats, and intimidation from his followers, some of whom engaged in online doxxing and aggressive campaigns against me; I was forced to relocate multiple times, living in temporary and unstable housing as a direct result of Defendant platforming a known stalker of mine; my professional opportunities, business relationships, and investor support were lost or withdrawn; and I suffered significant emotional distress, reputational harm, and fear for my personal safety.

In December of 2023, in addition to public attacks, Defendant and his current girlfriend engaged in direct harassment via private or blocked phone numbers, yelling, and intimidation. I did not engage and reported these incidents to my attorney at the time.

Defendant also repeatedly made unwanted sexual advances, both in person and via text, which I consistently ignored. These advances are documented in both texts and video and further

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

demonstrate a pattern of using his celebrity and influence to attempt to manipulate or intimidate me.

Defendant's conduct was deliberate, malicious, and intended to harm me. By spreading false narratives, mobilizing his followers against me, and leveraging his public platform, Defendant knowingly caused foreseeable and substantial harm, including financial losses, escalated harassment from his fanbase, housing instability, and severe emotional distress.

## IV. DEFAMATION - LIBEL / SLANDER

Defendant has repeatedly made, published, and republished false statements of fact about me to third parties, including through podcasts, interviews, and social media, with knowledge of their falsity or with reckless disregard for the truth.

On or about December 19, 2024, Defendant appeared on *The Hopeaholics Podcast* in an episode titled *"Bam Margera & Dannii Marie: The Neverending Betrayals,"* which was published and disseminated publicly via YouTube and other platforms to a broad audience. **[EXHIBIT D]**

During this interview, Defendant expressly named me and made numerous false and defamatory statements about me, including but not limited to the following assertions, stated as facts or as factual implications:

Defendant falsely claimed that I orchestrated a so-called "Florida Shuffle," asserting that he was placed into "13 different treatment centers at 90 days a piece back to back," costing approximately $660,000, and that I was responsible for this alleged scheme. These statements are false. Contemporaneous medical and administrative records demonstrate that Defendant was repeatedly discharged or transferred due to noncompliance and safety concerns, not retained for profit, which is the opposite of what would occur in any alleged "body brokering" or "Florida Shuffle" scheme. Defendant's treatment did not cost anywhere near the amount he claimed, and I personally incurred approximately $200,000 in Defendant's medical and guardianship related expenses, for which I was never reimbursed. Rather than acknowledge or repay these costs,

Defendant engaged in conduct that severely damaged my professional reputation and destroyed my ability to earn income.

Defendant further falsely stated that I have "six different names," implying criminality, deception, or identity fraud. This allegation is false and was made without any factual basis.

Defendant accused me of poisoning him, claiming that I "put some shit in [his] tea," and that he suffered multiple seizures as a result. Defendant further alleged that these seizures caused him to fall into a coma and require life support. These accusations are false. The incident to which Defendant refers occurred in December 2022, when Defendant was hospitalized after a drug relapse that took place while I was not present and had no involvement. Defendant and members of his family publicly attributed the hospitalization to COVID-19 and pneumonia, a narrative used to deflect accountability for the relapse. Contemporaneous medical records would establish that I did not poison Defendant, did not cause seizures, and was not present during the events in question. **[EXHIBIT D]**

Defendant repeatedly accused me of being a "murderer," including asserting that I "killed Amanda Rabb", that I caused Ms. Rabb's death through medication, and that I "faked the autopsy." These statements are categorically false, defamatory per se, and accuse me of serious crimes. Ms. Rabb passed away from natural causes, and Defendant's statements were made without any evidence and in direct contradiction to known facts.

Defendant also stated that I coerced him into publicly denying the existence of the "Florida Shuffle," claiming that I "made" him say it did not exist. This assertion is false and implies manipulation, coercion, and abuse of authority by me.

Defendant falsely claimed that I "paid him to do an interview," implying that I bribed or coerced him for his statements, when in fact I never paid Defendant any money for any interview or statement, as can be substantiated by financial records and contemporaneous documentation.

Although Defendant occasionally used qualifying language such as "probably" when repeating some accusations, the statements were nonetheless presented as assertions of fact and factual

implication, not opinion. Defendant's repeated narrative that I poisoned him, caused seizures, killed others, committed insurance fraud, and manipulated the legal and medical system which would be understood by a reasonable listener as statements of fact capable of being proven true or false. Such phrasing does not immunize Defendant from liability where the overall context conveys factual wrongdoing.

The following constitutes the entirety of Defendant's statements made on or about December 19, 2024, during his appearance on *The Hopeaholics Podcast* in an episode titled "Bam Margera & Dannii Marie: The Neverending Betrayals":

"I mean when I got locked up in the longest Florida Shuffle, 13 different treatment centers at 90 days a piece back to back to back $660,000… In Florida it's just a body snatch insurance thing... but when I was doing the Florida Shuffle of 13 different treatment centers… Her name is Lima Jevremovic and she has six different names she had to change probably for reasons of this; I've never had a seizure in my entire life until I met her. I went into five different seizures at 20 minutes a piece to the point where the shaman was so scared he took me to the hospital and on my fifth seizure I couldn't breathe on my own I woke up eight days later with a tube down my throat on life support with fucking covid and pneumonia and I just got done seeing her and and she paid me to do an interview she put some shit in my tea. But she killed a person named a Amanda Rabb with her fucking medicine and she faked the autopsy and said that it wasn't from what she did. Knock knock. Who's there? The FBI. Let's go! Yeah, Lima Jevremovic she probably changed her name by now. She goes up to all these treatment centers and gives this fucking bullshit. Bam just so you know, you have to do a saying, saying that you weren't in the Florida Shuffle cause that doesn't even exist. I'm like it does exist because I just did it it's 13 different treatment centers back to back because I got 5150 and I have to do 90 days but you guys keep finding reasons on the 88th day to keep me here and I can't leave I'm stuck in this body snatching Florida Shuffle Because of You Lima. Do you guys remember when I [said] I don't know what the Florida Shuffle is. I'm like you [Lima] made me say

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

that… Who am I gonna get sober for? You, Lima? You fucking murderer? No… Last time I talked about all this at once was with Lima and I went into a fucking seizure… You might as well say I was as good as dead to wake up eight days later from a coma, from a seizure probably from Lima–whatever her last name is. But um yes eight days with a tube down my throat because I couldn't breathe on my own only to wake up so weak and dehydrated…"

Defendant has made substantially similar defamatory statements before and after the December 19, 2024 interview and has continued to disseminate this false narrative across podcasts, interviews, and social media platforms, intentionally amplifying the accusations to his fan base and the general public. **[EXHIBIT D]**

Defendant's statements were made with actual malice, as Defendant knew the statements were false or acted with reckless disregard for their truth. Defendant was fully aware that I was not present during his relapse, did not poison him, did not cause seizures, did not profit from his treatment, and did not cause or conceal the death of Amanda Rabb. Defendant nonetheless published these accusations to deflect responsibility for his own conduct and to portray himself as a victim.

This quote is an example of Defendant admitting to a long-standing, continuous cycle of public defamation and slander. In his February 2025 interview, he stated:

"I would give Instagram posts all the time and be like, FBI take a look at fucking Lima because she faked an autopsy report claiming that Amanda died of whatever she died of a goddamn seizure. And that's a fact. You can look at the autopsy report that she whited out and wrote something different on. This is some shady fucking shit, you should charge her for murder." **[EXHIBIT E]**

Defendant's statements were made with actual malice and with reckless disregard for the truth, intending to harm my reputation, cause emotional distress, and interfere with my personal and professional life. This pattern of behavior demonstrates a deliberate campaign to publicly vilify

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

14

me while knowing that the allegations are false, which supports an award of exemplary and punitive damages.

As a direct and proximate result of Defendant's defamatory statements, I suffered severe reputational harm, loss of professional and business opportunities, withdrawal of investor support, harassment and threats from Defendant's followers, housing instability, emotional distress, and fear for my personal safety.

Defendant's conduct constitutes defamation per se, as the statements accuse me of serious crimes, moral turpitude, professional misconduct, and conduct incompatible with my profession and livelihood. I am therefore entitled to presumed damages, actual damages, punitive damages, and injunctive relief.

## V. HARASSMENT / CIVIL THREATS

Defendant has engaged in a deliberate and ongoing campaign of harassment against me by using his celebrity status and public platforms to incite, encourage, and legitimize harassment by his followers. Defendant repeatedly made inflammatory and false public statements about me, knowing that his fan base would act on them. As a direct and foreseeable result, I was subjected to coordinated online harassment, threats, intimidation, and doxxing by Defendant's fans.

Defendant further escalated this conduct by publicly amplifying and supporting a known stalker and obsessive superfan, despite being aware of that individual's history of harassment and fixation. By platforming this person and validating their narratives, Defendant empowered them to continue targeting me and my family, which directly destabilized my housing and forced me to live in temporary accommodations, including hotels, while repeatedly relocating to evade detection and harassment by Defendant's followers.

Defendant's actions were not incidental or accidental; they were calculated and malicious. He knowingly weaponized his influence to mobilize third parties to harass me, while maintaining plausible deniability by acting through his audience and proxies. This conduct caused severe

emotional distress, destabilized my housing, endangered my family, and forced me to take extraordinary measures to protect my safety and privacy.

Defendant also provided my personal phone number to multiple individuals, including his girlfriend Dannii Marie, who I had never shared my number with, resulting in repeated calls at all hours of the day and night to harass, intimidate, and threaten me on Defendant's behalf.

Defendant's conduct constitutes harassment and civil threats under applicable law and demonstrates a reckless and intentional disregard for my safety and well-being.

### VI. INVASION OF PRIVACY - PUBLIC DISCLOSURE OF PRIVATE FACTS

While Defendant did not directly publish my private information, he knowingly amplified and provided a platform for a known stalker and superfan who disclosed my personal and sensitive information, including my Social Security number, addresses, and other identifying details. By doing so, Defendant facilitated the public dissemination of private facts about me, placing me and my family at risk and causing significant emotional distress, fear for our safety, and ongoing harassment.

### VII. INVASION OF PRIVACY - FALSE LIGHT

Defendant has publicly portrayed me in a false and highly misleading manner, suggesting that I coerced, manipulated, or harmed him and others, including implying that I caused medical harm or was responsible for the death of Amanda Rabb. These statements place me in a "false light" by attributing to me actions, motives, and character traits that are untrue, offensive, and highly damaging to my reputation. Defendant's portrayal is made with knowledge of its falsity or with reckless disregard for the truth, and it has subjected me to widespread public contempt, ridicule, and harassment.

In a subsequent interview published on February 2, 2025, titled *"BAM MARGERA INTERVIEW 2025 - No Topic Off Limits Knoxville Steve-O and What's in the Future for Bam?"* on the *X5 Podcast,* Defendant continued and escalated his false and misleading portrayal of me to a broad public audience. **[EXHIBIT E]**

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

During this interview, Defendant again attributed severe medical events to me, falsely implying that my involvement caused or triggered his seizures, hospitalization, and near-death experience. Defendant stated that immediately upon meeting me, he began having repeated seizures and suggested that I may have poisoned him by "putting oleander in [his] tea," or otherwise harmed him for personal or financial benefit. Oleander is a toxic plant that retains its toxicity even when dried. These statements unmistakably imply intentional poisoning, criminal conduct, and attempted homicide. They are false.

Defendant further suggested that I benefitted from his alleged medical crisis and falsely insinuated that I was "somehow benefiting off the death of Bam," despite the fact that I was not present during the incident he references and had no involvement in the relapse and medical emergency that occurred in December 2022. Contemporaneous medical records and witness accounts establish that this hospitalization followed a drug relapse while Defendant was with third parties, not me. Defendant's public framing of this event falsely shifts responsibility away from his own conduct and places it onto me.

In the same interview, Defendant again accused me of falsifying an autopsy report relating to Amanda Rabb and repeatedly urged law enforcement to "charge her for murder," asserting as fact that I altered official records "with whiteout" and caused Ms. Rabb's death. These accusations are demonstrably false, inflammatory, and criminal in nature. Defendant presented them not as speculation, but as factual assertions, repeatedly stating that the matter was "a fact" and encouraging federal authorities to investigate and prosecute me.

Defendant also falsely portrayed me as the orchestrator of a scheme to control him through treatment, guardianship, and digital health tools.

He further placed me in a false and misleading light by grossly mischaracterizing my professional work and falsely depicting my company, Autonomous User Rehabilitation Agent ("AURA"), as irrational, unsafe, or fraudulent and ridiculed its purpose. In the February 2, 2025 interview, Defendant described AURA's clinical tools as involving "dinosaurs," "kitty cats," and nonsensical virtual experiences where he described the VR experiences as him "running away

from dinosaurs," implying that I subjected him to bizarre, ridiculous or harmful treatment practices.

When asked by the interviewer to describe the AURA software and virtual reality experience, Defendant stated the following, verbatim:

> "I can tell you that when you go to the kitty cat and you know watching an animal eat, like [it] is supposed to be some kind of form of therapy. Which makes sense cause I'll stare at a squirrel with a little nut the whole time like oh that's fucking cutest shit ever seen. So, when you see the kitty cat lick in the milk, you're like oh. And then you look over like oh so like I guess if you go this way then you might find some sense of peace to relax your mind but I mean some fuck-tart on crack might be like I'm going to go try to fight that thing [dinosaur] and go into a seizure. I saw me do it. Not during the helmet but when as soon as I met Lima I started having seizures left and right so Clockwork Orange."

Defendant's reference to "Clockwork Orange" is a culturally recognized allusion to the novel and film *A Clockwork Orange*, which depict the use of coercive, abusive, and psychologically harmful conditioning techniques imposed on an unwilling subject. By invoking this reference in connection with my work and the AURA software, Defendant falsely implied that I subjected him to involuntary, unethical, or psychologically abusive treatment practices. This implication is demonstrably false and grossly misleading. The AURA software is a voluntary, clinician-supervised digital health tool designed to assist licensed professionals in therapeutic settings, and it does not employ coercive or punitive methods of any kind. Defendant's use of this reference was calculated to evoke fear, outrage, and moral condemnation from the public, and has materially damaged my professional reputation and business by portraying my company as abusive, unethical, or dangerous, thereby undermining trust among clinicians, partners, and potential clients.

These statements are false. Defendant knowingly distorted the nature of his participation in AURA-supported treatment in order to ridicule my work and undermine my credibility. In reality, Defendant participated in location-based virtual reality exposure therapy exercises

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

conducted at Facility E, with his licensed clinician present. These exercises were designed to simulate real-world environments associated with relapse risk so that clinicians could safely measure stress responses and coping mechanisms.

One such environment was an airport and airport bar scenario. Defendant had previously stated that a recurring trigger for relapse involved missing flights, waiting in airports, and feeling pressured to drink at airport bars. In response, and in coordination with clinical staff, an airport-based environment was developed and utilized to allow Defendant to practice emotional regulation and decision-making in a controlled, therapeutic setting. No dinosaurs, cats, or fantastical elements were involved.

Defendant now falsely claims that his treatment involved absurd or imaginary content, despite knowing that his participation occurred in a clinical setting, with licensed professionals present, and that the environments were purpose-built based on his own stated relapse triggers. Contemporaneous records exist confirming the nature of these sessions, the clinical oversight involved, and the legitimate therapeutic purpose of the software.

Defendant's misrepresentation of AURA and my professional role was not accidental or humorous exaggeration. It was a calculated attempt to portray me as unstable, deceptive, or unserious, and to discredit both my reputation and my business in the public eye. By falsely depicting my work as "wacky" or dangerous, Defendant sought to strip legitimacy from my professional identity and to further support his broader narrative that I am untrustworthy or harmful.

This conduct contributed directly to public ridicule, loss of professional standing, and economic harm, and constitutes a false light portrayal that would be highly offensive to a reasonable person.

Taken together, Defendant's February 2025 statements place me in a false light by portraying me as a criminal, a poisoner, a murderer, a fraud, and a manipulator who exploits vulnerable individuals for profit. This portrayal is untrue, highly offensive to a reasonable person, and

inconsistent with the documented reality of my conduct and Defendant's own medical and legal history.

Defendant made these statements with knowledge of their falsity or, at minimum, with reckless disregard for the truth. He repeated and expanded these accusations long after being aware of the harm his prior statements had already caused, and after being aware that I could not publicly defend myself without violating confidentiality obligations. As a direct result, I have been subjected to widespread public contempt, ridicule, threats, harassment, and ongoing reputational and economic harm.

## VIII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendant's conduct toward me has been extreme, outrageous, and intentionally designed to inflict severe emotional distress. Beginning during and continuing after the period of my guardianship, Defendant has repeatedly published false statements about me across multiple public platforms, including podcasts, interviews, and social media channels, accusing me of criminal conduct, abuse, and causing the death of another individual. For example, on December 19, 2024, Defendant appeared on The Hopeaholics Podcast and made multiple false allegations about me, including that I poisoned him, caused seizures, and was responsible for the death of Amanda Rabb. These statements are demonstrably false and directly contradicted by contemporaneous medical and legal records, as well as my documented absence during the incidents he described.

In addition to public statements, Defendant has personally escalated harassment by directing intermediaries and associates, including his girlfriend and agents, to contact me at all hours of the day and night with threats, false accusations, and demands. Defendant further amplified this harassment by publicly platforming a known stalker and obsessive superfan, despite being aware of that individual's history of targeting me and my family. Through these actions, Defendant empowered others to harass me and my family, resulting in destabilization of my housing,

forcing me to live temporarily in hotels and constantly relocate to avoid detection and further harm.

As a direct and foreseeable result of Defendant's conduct, I have suffered severe emotional distress. I have experienced fear, anxiety, humiliation, and ongoing psychological harm. My professional reputation has been significantly damaged, causing loss of business opportunities, investor support, and other professional relationships. My personal and family life has also been disrupted, and I continue to experience ongoing mental and emotional suffering as a result of Defendant's intentional, outrageous, and malicious conduct.

Defendant acted with knowledge, malice, and reckless disregard for the foreseeable harm his actions would cause. His deliberate pattern of public defamation, social media attacks, and private harassment constitutes intentional infliction of emotional distress, causing substantial and ongoing harm.

## IX. ECONOMIC / BUSINESS HARM

As a direct and foreseeable result of Defendant's false statements, public harassment, and the ongoing campaign to disparage me, I have suffered substantial economic and professional harm. Defendant's deliberate misrepresentations regarding my conduct, including accusations of criminal behavior, abuse, and misconduct in connection with his treatment, have caused investors, business partners, and clients to distance themselves from me and my ventures.

At the time Defendant began publicly defaming me, I was operating Autonomous User Rehabilitation Agent (AURA), a digital health startup focused on supporting individuals with mental health and substance use challenges. My business at the time was valued at approximately $10 million. I volunteered my time to connect struggling individuals with resources, provide guidance, and advocate for them, without compensation, as part of my professional and social mission.

As a result of Defendant's actions, including his amplification of harassment campaigns, public statements on podcasts and social media, and false narratives portraying me as dangerous,

untrustworthy, and criminal, I had been forced to shut down AURA's operations, losing all clients, investor support, and business opportunities. My current business, which I am attempting to rebuild independently, has suffered significant devaluation, carries substantial debt, and faces potential permanent closure. Despite my ongoing efforts to salvage and restructure the business, Defendant's continued public statements, videos, and vocal attacks on me have made it extremely difficult to recover and sustain the business.

Defendant's intentional and malicious conduct has interfered with my professional endeavors, diminished the value of my business, and caused demonstrable economic harm, all of which were foreseeable consequences of his actions.

## X. INJUNCTIVE RELIEF - REMOVAL OF DEFAMATORY CONTENT AND PUBLIC RETRACTION

As a direct result of Defendant's false and misleading statements, I have suffered significant reputational and emotional harm, as well as economic damages. The harm continues and is ongoing, as Defendant's podcasts, social media posts, and public interviews remain accessible to the public and continue to shape perceptions of me.

I therefore request that the Court issue injunctive relief requiring Defendant to:

1. Immediately remove or cause to be removed from all platforms any and all content, including podcasts, videos, social media posts, and interviews, containing false, defamatory, or misleading statements about me;

2. Issue a public retraction and apology acknowledging the falsity of the statements, clarifying that I did not engage in any criminal, abusive, or immoral conduct as alleged, and retracting any claims that I caused harm to Defendant or others;

3. Cease any further public dissemination of false or defamatory statements about me, including through intermediaries, agents, or followers;

4. Take any other action deemed necessary by the Court to prevent further harm and protect my reputation and personal safety.

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

22

Without such injunctive relief, the harm to my reputation, business, and personal safety will continue to escalate, and monetary damages alone will be insufficient to remedy the ongoing injury caused by Defendant's misconduct.

## XI. PRAYER FOR RELIEF

WHEREFORE, I respectfully request that this Court grant the following relief:

1. General and Special Damages in an amount to be determined at trial, including but not limited to damages for defamation, emotional distress, harassment, reputational harm, economic losses, and loss of business opportunities;

2. Injunctive Relief requiring Defendant to:
   - Remove or cause to be removed all defamatory content from all platforms, including podcasts, social media, and interviews;
   - Issue a public retraction and apology acknowledging the falsity of the statements and retracting all claims that I engaged in criminal, abusive, or immoral conduct;
   - Cease any further public dissemination of false or defamatory statements about me, including through intermediaries, agents, or followers;

3. Punitive Damages as allowed under applicable law to deter Defendant from engaging in further malicious, reckless, and intentional misconduct;

4. Pre- and Post-Judgment Interest as allowed by law;

5. Costs of Litigation, including attorney's fees, to the extent permitted by law;

6. Any Other Relief that the Court deems just and proper to redress the harm caused by Defendant's unlawful conduct.

## DEMAND FOR JURY TRIAL

I hereby demand a trial by jury on all claims so triable.

COMPLAINT FOR DEFAMATION, AIDING/ABETTING HARASSMENT, AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

23

Respectfully submitted,

Dated: December 18, 2025                         Respectfully submitted,


_____
Lima Jevremovic